Next matter is Gabriel v. Alton Memorial Hospital, 5-24-0729. Counsel for the appellant, if you are ready you may proceed and please identify yourself for the record. Good morning, your honor. I'm Lanny Doar. I represent the estate of James Gabriel. And I'm the appellant in this matter. In a nutshell, in summary fashion, this case involves a transport of a patient from a hospital to a nursing home. And during the course of that transport, he toppled over, was injured, and subsequently died. And I'm aware that the court's aware of the record of the facts in this case and that it's up here on summary judgment. But there's two issues I want to reiterate because I think they're the crux of my argument today. Which is that on January 31st, 2024, this matter was before the trial court for the purpose of scheduling, including scheduling 213F3 deadlines. And at that time, all the parties in the court agreed to move that deadline down the road because of some issues with getting the nursing home's witnesses deposed. Notwithstanding, and why those deadlines were still undefined, on March 15th, 2024, the trial court entered summary judgment for the hospital, finding that the ambulance crew's conduct could not be found, as a matter of law, to have been willful and wanton. And that was the standard that the plaintiff needed to meet in this case. There's the Emergency Medical Services Act, which provides immunity for ambulance crews for claims of negligence. But there is no similar immunity for willful and wanton misconduct. And in this case, what the trial court did was it granted a Celotex-type motion, which comes from the Celotex Corporation v. Catrerit, which is a U.S. Supreme Court case that has been adopted and approved and ratified under Illinois authority. And basically, the Celotex-type motion is one that argues the plaintiff was unable to prove her case due to a lack of evidence. It doesn't rely on affirmative evidence by the moving party. It points out and relies on a lack of evidence by the plaintiff. And under those circumstances, the case law is that it is only appropriately brought once the fact discovery is done, and in this case, which would be very relevant and I'll talk about a little bit later, after you've had 213F3 or opinion witness disclosures. The court did not wait for those deadlines to be established and for those disclosures to be made. It went ahead and ruled on a pending motion for summary judgment, with no argument, but a pending motion for summary judgment, which was identical to an earlier motion for summary judgment, which had been denied. Under all facts, and in this case, the hospital's motion would have only been appropriate once the fact and expert witness had been disclosed, had been closed. At that time, the plaintiff was unable to present standard of care evidence, testimony, and argument that the conduct of the ambulance group violated that standard of care. Only under those circumstances would a subtext type motion have been appropriate. And in this case, the defendant's, the crux of their case was that their ambulance crew's conduct could never be perceived as willful, They didn't have any expert testimony that set an appropriate standard of care. All they did was attach their two EMTs, or one was a paramedic, one was an EMT's, deposition transcript and said, see judge, these guys did the best they could, but they dropped this guy and they could never be guilty of willful and wanton misconduct. The problem with that was that that wasn't all the facts of the case, but most importantly, it relied on the trial court to determine what was the appropriate standard of care for an EMT. This was a medical malpractice case, essentially, because it had a 622 affidavit attested to by a doctor. We had not reached the point of 213F3 opinion witness disclosures, so when the judge ruled on this motion for summary judgment, he had no basis to determine, A, what the standard of care was, and which actions or inactions constituted a violation of the standard of care, and he certainly had no basis to determine whether or not those violations would constitute negligent violations or willful and wanton violations. As the court's aware, the case law is replete with cases that say, only in very rare circumstances should the issue of willful and wanton be taken away from the jury. But certainly this was an even more egregious violation because in this case, there was no standard of care established by the, or for the trial court to judge the conduct of the EMS crew, the emergency medical services crew, that dropped Mr. Gabriel, causing his eventual death. And of course, it's an axiom of Illinois law that a, no one but a qualified expert witness can set the standard of care. The trial court is not in a position to say what the standard of care is for a hospital or a hospital's medical crew. That must come from expert testimony. And for him to wade into that area and decide what the standard of care was, was a violation of his discretion and the law that allowed him to consider this issue. And in the briefs that it was discussed, and it was discussed in the trial court's order, probably the most similar case is Prowell v. Loretta Hospital, which was a 2003 case, which was very similar to our facts, which was Amber's crew drops a lady being transported into a hospital. She eventually dies. And there the allegations were that they inadequately strapped the patient to the gurney. They failed to properly hold or grip the gurney. And it failed to abide by their training. Almost identical allegations to what has been made here by the plaintiff. And in this case, I'm sorry, in Prowell, the trial court granted summary judgment. It went up on appeal. The appellate court reversed, saying that it's not for the trial court to decide whether those violations, that a jury could, after hearing the standard of care, could conclude that those violations were woeful and wanton as opposed to mere negligence, and therefore it was a jury question and it should go back and be tried. And as part of Prowell, we related the woeful and wanton standard of care to be articulated in a case like ours when it's cited back to American National Bank and Trust v. Chicago, which is another paramedic EMS case that says, the woeful and wanton is the reckless disregard for the safety of others, such as the failure after knowledge of impending danger to exercise ordinary care to prevent it, or failure to discover the danger through recklessness or carelessness when it could have been discovered by an exercise of ordinary care. And it went on to say, when applying that standard, that even if the ambulance crew's version of events is accepted, which is what the trial court did here, that's still not for the trial court to decide whether or not those were woeful and wanton violations. That must go to the jury. And that's what we're asking the court to do here today. But in particular, the facts in our case were similar to the Prowell case, that we had a sidewalk that was described as sketchy by the paramedic because of its configuration and the fact that it lacked a budding soil, which resulted in a six- to eight-inch drop off the sidewalk, that Mr. Gabriel was approximately 5'10", 350 pounds, 330 pounds, and was unable to control his movement while he was strapped into the gurney, meaning that when the ambulance took a turn, he couldn't prevent himself from falling over in the back of the ambulance. But that was never conveyed by one of the EMS to the other paramedic during the transport. And in this case, as they're going down the sidewalk somehow, which is really kind of unexplained, they lose control of the gurney. It goes off the six- to eight-inch dip, topples over on its side. Mr. Gabriel goes to the ground, breaks a vertebrae in his neck, has to be transported back to a hospital, and then goes to St. Louis University Hospital where he dies three weeks, a month later. So all of those facts, even in the absence of expert testimony, would give rise to an issue as to why weren't these ambulance crew able to control this man, why didn't they get more support, and why did they take this pathway? Didn't the evidence, didn't the records show they took that pathway because they were told to take that particular pathway? They were told to take that pathway by the nursing home, but they didn't have to take that sidewalk, or at least they could have paid attention to what they were doing on that sidewalk. They had two options available to them. They could have paid closer attention and not let their wheels get so close to the six- to eight-inch drop-off on the sidewalk. Just as in trial, the court said not looking at it and knowing that you're running into a pothole with a gurney could easily be willfully wanted misconduct. Same thing here. If you're letting the wheels get so close to the edge of a sidewalk that you don't realize you're about to drop this man off six to eight inches, that could be considered willfully wanted misconduct. The second option they had was they had a gurney that was rated for grass or yard transport. So rather than going across this sidewalk that has been characterized by the EMTs as sketchy, they could have just transported him through the grass. And with a modern gurney, that's not a difficulty. They can just walk him right through, and they wouldn't have those problems. They certainly wouldn't have had the six- to eight-inch drop-off. But with all those facts, the trial court needed to, at a minimum, wait until fact discovery was closed and until 213F3 opinion deadlines had passed. Then they could judge the conduct of these ambulance crew in the basis of standard of care evidence. But in the absence of the standard of care evidence, the trial court has no basis to judge this conduct. With a 622 case against an ambulance crew, which the case law is that you need a 622 against an ambulance crew and against the hospital, he needed to wait until he had some kind of professional opinion witness to characterize this. If the plaintiff couldn't come up with an opinion witness, that would be a basis for summary judgment. But you don't know that. You can't adjust that until you've had a disclosure deadline established, which the court and the parties agreed to postpone just 45 days before because of difficulties getting scheduling completed of fact witnesses. What about that picture of the crumbling cycle? Was that a year after the fact? Well, there's some question as to whether the sidewalk was fixed before this accident happened, not whether it crumbled after the accident. It was whether it had been fixed before the accident. And Mr. Bell, I believe, testified that it did look like that on the day of this incident. And Mr. Brooks testified, no, it didn't. It was different at that point. They had fixed it by that point. All right. There was a conflict in the evidence on that. Any questions? I'm not going to make Apolli's argument, but I'm going to assume she's going to argue that your failure to respond to the summary judgment is going to be part of her argument today. So when you come back on rebuttal, depending on what counsel talks about, I'm going to ask you about that. Sure. Thank you. All right, Apolli, you may proceed. Please identify yourself for the record. Good morning, Your Honors, and may it please the Court. I am Irina Dmitrieva on behalf of Alton Memorial Hospital. Your Honors, this is a six-year-old case in which fact discovery began at least in December of 2019. Five years ago, in March and July of 2020, plaintiffs deposed the ambulance crew that transported Mr. Gabriel, Harold Brooks, and McKinley Bell. Since then, plaintiffs did not request any additional witnesses or discovery from Alton Memorial Hospital. Three years ago, in September of 2022, plaintiffs opposed Alton Memorial's first summary judgment motion, making basically the same arguments he's making right now, that they require additional fact and expert discovery, at which point the trial judge said, the age of the case is such that summary judgment might be appropriate, but I will oblige and I will let plaintiffs take additional fact and expert discovery. And the judge ordered the plaintiff to go forward in his depositions and his expert. And the judge also asked plaintiffs to propose discovery deadlines, to submit scheduling order within a week, which plaintiffs did not do. And that was in September of 2022. Now, two years ago, in June of 2023, plaintiffs did depose a representative of the nursing home facility, University Home Center. Her name was Susan Hallerton. She was a chief nurse on duty at the time the incident took place. And Ms. Hallerton testified that she did not witness the incident. She does not believe that any other personnel on duty at the time witnessed the incident, because they all came out of the nursing facility only after the fall had taken place. And she also told plaintiffs that there is no CCTV footage of the incident, so there is no video available. And thus, everything that could have been discovered about this particular fall has been discovered. There are no additional occurrence witnesses, and there is no video footage. And yet, nearly half a decade later, we are here with plaintiffs still making an argument that she should be able to rely on the allegations of her complaint filed in 2019 to oppose summary judgment, and on the certificate of merit attached to the complaint from an unnamed physician, which happened before all the discovery took place. And we still, to this day, do not know the name of an expert that plaintiff promises to produce in this case to break the genuine issue of material theft for trial. And your Honor, this is precisely the situation in which summary judgment is appropriate. Various courts have described summary judgment as a put-up-or-shut-up moment in the litigation. And in SEAL Attacks, on which plaintiff relies, the Supreme Court explained that one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims. And summary judgment should be entered after adequate time for discovery against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. What's your response to your opponent's claim that the trial judge could not have granted summary judgment because there was no standard of care established? Right. And your Honor, so to begin with, certainly if plaintiff wanted to get expert discovery, they had ample opportunity to do so. As in September 22, the trial judge told the plaintiff, proceed with your expert discovery. And that was several years ago. And all the facts about Alton Memorial's conduct in this case were known five years ago. There was no additional discovery. But on a principal level, we do not believe that expert discovery on the standard of care is necessary here. Because standard of care goes to negligence. Whether the actions of the crew were below the standard of care. We are dealing here with a willful and wanton count that goes beyond any violation of a standard of care. Willful and wanton goes to the state of mind of the defendant. And it asks, was there any intentional harm, intent to harm, utter indifference, or cautious disregard? Are you saying that standard of care is not susceptible to expert testimony? Is that what you're saying? There are two points, Your Honor, if you could just indulge me. Because I haven't finished with my first answer. So my point about the expert testimony on the state of mind would be a legal conclusion. So there's a case where we cited in the brief states that when an expert testified that a certain conduct amounted to willful and wanton, or was reckless, was wanton, it's a legal conclusion. Because those terms are legal terms of art. Expert only can testify whether there was a departure from a standard of care and how much of a departure. And, you know, that goes to negligence. Again, some plaintiffs in those cases, they do produce expert testimony saying that there was a departure and it was a large departure. So those who had an opportunity to do so, they did not. But there's also a faulty argument there is that just because 262 affidavit was necessary for a complaint, it means that an expert testimony is necessary about the standard of care negligence. And so the case which plaintiff cites, you know, in which she relies, Lyon v. Hospital Industries. It's a Fourth District from 1987. The court addressed the question there. It said the purpose of Section 262 was to eliminate frivolous lawsuits at the pleading stage. Thus, that expert testimony would not be needed at trial to establish negligence, does not address the necessity of complying with Section 2622 at the pleading stage. So the legislature wanted to eliminate frivolous medical malpractice lawsuits. And that is why, if there are any allegations of medical, you know, malpractice, there has to be a Certificate of Merit attached to the complaint. But then now when actions proceed to discovery, there are some actions, just like this one, when the paramedics are, you know, rolling the gurney along the sidewalk. Do we need an expert to tell the jury whether there was, you know, negligence in this particular case? Arguably not. Arguably it's not outside the province of the law to eliminate circumstances in this particular case. But then again, were he in a case where even if the paramedics violated the standard of care, they have statutory immunity for it. And the Supreme Court explained that the reason for that statutory immunity was to encourage people to go into this profession and to eliminate that, you know, to encourage them to go into less than ideal circumstances. Because, you know, by definition, when emergency medical technicians and paramedics are called, most of the time they encounter less than ideal circumstances. A bathroom, you know, on the second floor of a building where a woman is given a birth. Or, you know, an asthma attack, you know, in a dark room when they have to carry a person through the porch. And under the statute, the standard is the same for emergency and non-emergency medical services. And so, you know, if, you know, we accept the plaintiff's argument here and say there was an error of judgment, then the headrest should have been flat and not at 30 percent. Maybe they would have tightened, you know, stripped more, even though there's clear evidence in the record that, you know, when Mr. Gabriel fell, he was still stripped to the gurney. And any type of, you know, strip would have been a restraint. So, I mean, the allegations that are made here in the complaint, they've been disproved and discovered. But even if we accept that there may have been an error of judgment at the time, that would be negligence. That would not amount to lawful unwanted. And if paramedics are holding to court and have to stand trial based on that, you know, error of judgment, that would defeat the entire purpose of the statutory immunity. Because, you know, here, again, for the benefit of hindsight right now, say, okay, well, this is sketchy, you know, maybe plaintiff is speculating now that maybe they should have taken the gurney through the grass. My bet is if they did take the gurney through the grass and the nursing home is on the slope, there is like a ravine there, a little creek, and it's on the slope. If they did take the gurney through the grass and then the gurney flipped, there would be here where the plaintiff argued there was a sidewalk specifically designated by the nursing facility for ambulance crews. Why did they take, you know, the grass? So we're dealing here with a very practical circumstance in which, and the evidence is clear, neither paramedic had knowledge of any prior falls or incidents on that sidewalk. The ball testified in Brooks has been a paramedic for 30 years. He said, I've always, you know, transported people to this facility, never had a tip over. Bell has been an EMT for two years at the time. He said his previous employer, this nursing home, was our regular, you know, destination. I've never heard of any other paramedics having a fall. I've never had a fall there. So they do not have any awareness that by taking this path, they're exposing this particular patient to a significant risk of harm. And that is the inquiry that's relevant to the Willful Unwanted Count. Is there any consciousness, awareness, that they're exposing, that they might expose a person to a serious risk of harm, which distinguishes this case from Loretto Hospital? Because in Loretto Hospital, there was evidence that the paramedics left the gurney, which did not have brakes, completely unattended. So they took the gurney out of the ambulance, and one of them didn't even remember where it was, where he was, and the other paramedic turned away from the gurney to close the ambulance doors. And the gurney that did not have any brakes rolled into a pothole, and the person slid headfirst onto the concrete, and, you know, there was a fatal injury there. So what was important for Loretto Hospital, and again, it's not even a controlling decision for, you know, this district, because it comes from a different district, but what was important is that they left the gurney unattended. Or there was also evidence there saying, one of the paramedics believed that their legs were not locked. And so that is something that shows awareness of facts that to a reasonable person would reveal a serious risk of harm. And that is completely absent here, because both paramedics testified very clearly, there is no other evidence contradicting it, that they held on to the bars even as the gurney started tipping over. And those depositions are very candid, they're not so servant at all. You know, those two gentlemen, they just, you know, described how things happened, and they're very, very candid depositions. So to answer, you know, your honest question, we do not believe that expert testimony is necessary in this case. We're beyond negligence. Even if plaintiff thought that it would be helpful to the case, she had an opportunity to do so since September 2022, and they didn't take this opportunity. All the evidence shows that paramedics exercised care. They used the right gurney. They strapped them five straps. They loaded to provide stability. And so the overwhelming evidence in the record shows that if there are any factual disputes here, it's about the quality of care. And there's precedent stating that if the question is only about the quality of care, it does not preclude summary judgment in the case. So unless you want to have questions. No questions. I think you somewhat answered what I asked the opposing counsel. I think you pointed out in your brief that there was no response. There was no response. By the plaintiff to the summary judgment. No affidavit, no brief, no nothing. No. So during the hearing, what happened is that during the hearing on summary judgment, where this counsel stated that they stood on their response to the first summary judgment motion, which was two years ago. And I think your argument, and you hit it again, is their Rule 191B was not compliant. It was not compliant. There was no named doctor. No, it was not compliant. And counsel, on reply, argued that she doesn't have to comply with 191 because, you know, it's a civil tax type motion. Or Rule 191 doesn't make exceptions for civil tax and non-civil tax motions. But she certainly presented in the trial court that she called his affidavit a 191 affidavit. So it's kind of a change in the strategy to claim now that she doesn't have to comply with 191 because certainly in the trial court she believed that she had to, but it was not compliant. No. Thank you. Thank you. We're off with summary judgment BFR. Thank you. Ellen, rebuttal. Briefly, just to respond. We did not file a supplemental response to our original response to the motion for summary judgment because nothing factually had changed. Okay. It was the same facts and it was our same argument that we had presented before. We had a 191B argument on file, and we told the court at that time, we were standing on all of our same arguments, that this was premature, that we needed to have our expert. The whole thing was going to boil down to standard of care testimony. But also, the case law is clear that when responding to a Celotex motion, which is what they did here, there is no permanent proof on the defendant. They don't need a 191 affidavit or anything else. And we cite Williams First Covenant Medical Center, which is also a 4th District case for that proposition, and there's some other citations in our brief. But we've also cited in our brief that they made no objection to any deficiencies in our 191 affidavit that was filed in the trial court. The case law is clear. You can't make an objection to a 191 affidavit for the first time on appeal and whether its efficiency was fine. They should have brought that up at the trial court level. But to put this whole case in a little bit of context, this was the epitome of a COVID case. And one of the additional problems was we were dealing with a nursing home who was shut down by and large by COVID, and we were having probably the most difficult time I've ever had trying to get discovery out of that. And I don't say that out of context. That's reflected in the record in this case, and I think everyone agreed the delay in getting this case to where it was was not from my fault, was not from plaintiff's fault. That was from the conduct of the nursing home that went to the point of we had ruled to show cause orders against them. We had default orders entered against them. We had – they got vacated. The court vacated the default against them. They were sanctioned. So this conduct was not us. It was the nursing home, and I can't blame the hospital for this either, but it was the nursing home not getting us the information we needed. And the whole reason that this matter – the deadlines were continued in January was because we still had their maintenance guy that he would not cooperate, and they would not assist us in cooperating in getting him deposed. So that was the whole point. We needed to get this maintenance guy. Once again, it was coming down to this sidewalk, and we didn't want to have expert disclosures until we could have the final deposition of this one witness. But as far as whether or not expert witness testimony is required, the Lyons v. Hasbro case says that it's required in a nursing home case. There's also a case we cited in our brief that says even just a dispute as to whether or not someone was properly secured to a gurney in a hospital requires a 622. That's still medical malpractice. The adequacy of confining and moving someone on a gurney is subject to a 622. So that's the law. I mean, unless they want to approve new law that a hospital doesn't need a 622 when it's something administrative, but I don't think that that's what they want to do in this case. Finally, the standard of care is important. It just doesn't go to negligence. It's still important when you're judging the conduct. You have to know what would a reasonably carefully trained EMT do under these circumstances, how did he respond, and was that willful and wanton when you're giving the willful and wanton instruction. So until the trial court didn't have that standard to go by either, they had to have what's the minimum permissible standard, the standard of care, what was the EMT's conduct, and how did it fall on that spectrum between negligence and willful and wanton. Any further questions? Thank you, counsel, for your arguments. We will take this matter under advisement and issue a ruling in due course.